Karra J. Porter, #5223
    Karra.Porter@chrisjen.com
M. Tanner Clagett, #15823
    Tanner.Clagett@chrisjen.com
CHRISTENSEN & JENSEN, P.C.
257 East 200 South, Suite 1100
Salt Lake City, Utah 84111
Telephone: (801) 323-5000
Facsimile:  (801) 355-3472
*Attorneys for Plaintiff Agnes J. Martinez*

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| AGNES J. MARTINEZ, individually,<br><br>Plaintiff,<br><br>v.<br><br>LANE S. WOLFENBARGER, in his individual capacity; PAUL D. MULLENAX, in his individual capacity; and SALT LAKE CITY, a municipal corporation.<br><br>Defendants. | **COMPLAINT**<br><br>**AND JURY DEMAND**<br><br>Civil No.<br><br>District Judge |

Plaintiff Agnes J. Martinez, by and through undersigned counsel of record, hereby complains against the above-named defendants as alleged below:

## INTRODUCTION

This action arises from injuries inflicted upon an unarmed woman by two Salt Lake City police officers, injuries so severe that the woman's leg had to be amputated. On September 2, 2023, 57-year-old Agnes Martinez was experiencing homelessness. She was looking for a place where she and her dog Gypsy Rose could sleep in her 1999 Ford Explorer without being harassed. No one reported Agnes. No one claimed she was harming anyone or committing any crime.

Defendants Wolfenbarger and Mullenax were on what they called "proactive patrol" – basically looking for someone to confront. They found Agnes. After ordering her to roll down her window, Wolfenbarger declared that he smelled cannabis. Yeah, there was a "little bit of weed" in the car, Agnes said.

The officers ordered Agnes out of her vehicle while Wolfenbarger searched it. Minutes later, Wolfenbarger told Agnes that she was "going in handcuffs." Surprised, Agnes asked, "Why?" Wolfenbarger refused to answer. The officers drew Agnes's arms behind her back. Again asking "Why?", Agnes tensed her arms. Because Agnes was "not relaxing", the officers used a takedown method so dangerous that it has been declared unlawful when used against a minimally resistant nonviolent misdemeanant.

The officers injured Agnes so badly that she had to undergo multiple surgeries and an above-the-knee amputation of her left leg. The force was unnecessary, excessive, grossly disproportionate, and violated law that has been clearly established in the Tenth Circuit since at least 2022. Agnes brings this action to vindicate her constitutional rights.

**PARTIES**

1.     Plaintiff Agnes Martinez ("Agnes" or "Plaintiff") is a native of New Mexico who, at all times relevant to this complaint, was a resident of Salt Lake County, State of Utah.

2.     Defendant Lane S. Wolfenbarger ("Wolfenbarger") is an individual who, at all times relevant to this complaint, was a resident of the State of Utah. At the time of the events complained of, Mr. Wolfenbarger was a law enforcement officer employed by Salt Lake City. Mr. Wolfenbarger is sued in his individual capacity.

3. Defendant Paul D. Mullenax ("Mullenax") is an individual who, at all times relevant to this complaint, was a resident of the State of Utah. At the time of the events complained of, Mr. Mullenax was a law enforcement officer employed by Salt Lake City. Mr. Wolfenbarger is sued in his individual capacity.

4. Defendant Salt Lake City is a political subdivision of the State of Utah.

## JURISDICTION AND VENUE

5. This action raises questions under the Constitution of the United States and 42 U.S.C. § 1983, and this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343. Supplemental jurisdiction of Agnes's state law claims is appropriate under 28 U.S.C. § 1367.

6. The events alleged herein occurred in Salt Lake County, Utah. Venue is proper in this Court under 28 U.S.C. § 1391(b).

## FACTUAL BACKGROUND

*Events prior to the injury*

7. On September 1, 2023, Agnes Martinez was experiencing a time of homelessness. That evening, she attempted to locate a place where she and her dog could sleep in her vehicle without fear of harassment.

8. Agnes parked her 1999 Ford Explorer near 425 West 1700 South in Salt Lake City.

9. At approximately 8:30 p.m., a Salt Lake City Police Department vehicle driven by defendant Wolfenbarger approached Agnes's parked car.

10. No one had complained about Agnes or claimed to see her committing an offense.

11. Wolfenbarger stated in his report that he was engaging in "proactive patrol".

12. Wolfenbarger approached Agnes's vehicle and indicated for her to roll down her window.

13. According to his report, Wolfenbarger told Agnes that "we have been having problems in that area and it would be best to not park here."

14. Agnes signified agreement with what Wolfenbarger stated. She put her seat belt on and prepared to look for another place to park.

15. Wolfenbarger and Mullenax told Agnes she could not leave.

16. Wolfenbarger ordered Agnes to exit her vehicle.

17. Mullenax directed Agnes to stand out of reach of her vehicle and stood near her.

18. Agnes is about 5'2" tall. She was visibly unarmed; neither officer felt a need to pat her down.

19. Agnes was wearing a tank top, sweater, black mid-calf shorts, and flip flops.

20. Wolfenberger said, "it smells like marijuana in here" (referring to the vehicle).

21. Agnes stated that she had a pipe and "a little bit of weed."

### Search of Agnes's car

22. Wolfenbarger stated that he intended to search her car.

23. Agnes asked if he needed a warrant. Wolfenbarger said no, "it's a vehicle exception." "But it's my home," Agnes replied. Wolfenbarger repeated that no warrant was needed because "it's a vehicle exception".

24. Wolfenbarger stated in his report that he "started to perform a warrantless search, based on plain smell, of the vehicle."

25. At this point, Agnes had complied with the officers' commands.

26. At this point, Agnes had not been told that she was under arrest.

27. At this point, Agnes had not been taken into physical custody.

28. At this point, Agnes was not near her vehicle. Nothing in her vehicle was within her immediate control. Agnes could not access the interior of the vehicle.

29. At this point, there was no exigency that would have prevented Wolfenbarger and Mullenax from seeking a warrant (including an e-warrant) to search Agnes's car.

30. Wolfenbarger began rummaging around in Agnes's car.

31. Wolfenbarger did not prepare an inventory of items searched or observed in Agnes's car.

32. Wolfenbarger's purpose in the search was not to protect the car and its contents.

33. Wolfenbarger was looking for incriminating evidence.

34. Wolfenbarger opened containers and other enclosed items in Agnes's car.

35. Wolfenbarger could not see the contents of the enclosed or opaque items before he opened or emptied them.

*Leg Sweep and Injury to Agnes's Leg*

36. While Wolfenbarger was searching her car, Agnes stood where defendant Mullenax had directed her.

37. Agnes did not make any threats.

38. Agnes did not attempt to flee.

39. Wolfenbarger found one or two items that he concluded might be drug-related.

40. Wolfenbarger returned to Agnes and told her to place her hands behind her back.

41. Agnes was confused. "Why?" she responded.

42. Wolfenbarger said, "Because you're going in handcuffs."

43. Agnes again asked, "Why?"

44. Wolfenbarger chose not to answer Agnes's question or provide any explanation to her.

45. Wolfenbarger replied, "Because."

46. Wolfenbarger shoved Agnes up against her vehicle.

47. Agnes tensed as Wolfenbarger and Mullenax braced her arms behind her back.

48. Wolfenbarger said, "Stop. We're gonna take you to the ground next. Do you wanna do that? Do you wanna go to the ground? Relax your arms. Relax your arms. Right now."

49. Less than two seconds later, Wolfenbarger said to Mullenax, "Ground."

50. At this moment, Agnes was, at most (according to the officers' own statements), minimally resisting the officers' efforts to handcuff her.

51. At this moment, Agnes was not attempting to flee.

52. At this moment, Agnes was suspected of (at most) a nonviolent misdemeanor.

53. At this moment, Agnes did not pose a risk of serious harm to the officers.

54. At this moment, Agnes did not pose a risk of serious harm to any member of the public.

55. Wolfenbarger placed his right leg next to Agnes's left leg in order to trip her. Wolfenbarger then performed a leg sweep maneuver.

56. Agnes was slammed to the ground, landing on her left leg.

57. Wolfbarger dropped his weight onto Agnes's left leg above the knee. Mullenax dropped his weight onto the lower part of Agnes's leg.

58. The degree of force used by the officers was not proportionate to the degree of Agnes's alleged minimal resistance.

59. Mullenax felt Agnes's leg break.

60. Wolfenbarger heard Agnes's leg "crack."

61. Consistent with statements captured on his body camera, Wolfenbarger admitted in his report that he (and Mullenax) took Agnes to the ground because she "did not relax". Wolfenbarger wrote, "She didn't relax so I initiated a take down placing my right leg next to her left leg to trip her."

62. Nearly a year before these events, the Tenth Circuit had expressly held that "the use of the takedown maneuver to slam to the ground a nonviolent misdemeanant who poses no immediate threat to the officer or others based on minimal resistance to arrest is unreasonable and constitutes excessive force under the Fourth Amendment." *Surat v. Klamser*, 52 F.4th 1261 (10th Cir. 2022); *id.* at 1277 (holding that Fourth Amendment was violated when officers "us[ed] a takedown maneuver to throw Ms. Surat to the ground while she was resisting arrest for a nonviolent misdemeanor and not posing an immediate danger to Officer Klamser").

63. Agnes cried out in pain. She called out, "My leg! My leg!"

64. At this time, both officers knew that Agnes had a broken leg.

65. At this time, both officers knew that Agnes had never attempted to flee and was now physically incapable of attempting to flee.

66. Still insisting on handcuffing Agnes, Mullenax pulled on Agnes's broken leg to force her onto her stomach. Agnes screamed in pain.

67. Agnes's face was cut from being forced face-down onto the concrete.

68. Agnes advised the officers that she has asthma and COPD. She informed the officers that she could not breathe and asked them to retrieve the two inhalers in her purse.

69. Agnes asked, "Get me up. I can't breathe." Wolfenbarger said, "You have a busted leg. We're not gonna get you up but we'll roll you in the recovery position."

70. The officers located Agnes's inhalers and administered the medications.

71. Agnes continued exclaiming in pain.

72. Agnes repeatedly asked if she or an officer could call her daughter.[1] Wolfenbarger and Mullenax denied the request.

73. At one point as she was sitting on the ground crying, Agnes asked, "Why?" Neither officer answered her.

74. At some point, medical personnel arrived. They sliced Agnes's capri pants past her left knee and saw "significant swelling".

75. Another officer who had arrived asked Wolfenbarger, "How'd that happen?" referring to Agnes's leg.

76. Wolfenbarger responded, "We went to take her to the ground and I guess her leg got caught under her."

77. The officer responded, "Well, that'll happen."

78. Wolfenbarger did not activate his body camera during his initial encounter with Agnes.

79. Wolfenbarger and Mullenax both turned off or muted their body cameras at multiple points during the process.

---

[1] Agnes's daughter resides locally, but Agnes did not mention that on the scene.

*Amputation of Agnes's leg and other injuries*

80. Agnes was taken by ambulance to a nearby hospital.

81. An Emergency Department physician's note stated, "Patient was in an altercation with police. Report is that she kicked the officer and tried to run away. She was tackled from behind."[2]

82. The physician immediately recognized Agnes's injury as so severe that it was "limb threatening," writing:

> *Patient with limb threatening arterial injury* in the setting of trauma. Patient required emergent bedside reduction. Multiple reassessments. Initiation of anticoagulation. Time spent in consultation with specialists. Multiple reassessments at bedside. Patient requiring admission to ICU, bedside evaluation with vascular service. Complex medical decision making. *High potential for limb loss or debilitating injury*. [Emphases added]

83. Doctors attempted to save Agnes's leg through surgery. Ultimately, however, infection and other complications left no choice but to amputate.

84. On September 27, 2023, doctors performed a through-the-knee amputation of Agnes's left leg.

85. On September 29, 2023, doctors amputated another portion of Agnes's leg above the knee.

86. Agnes endured severe pain for months, from the moment when officers broke her leg through the amputations and beyond.

87. Agnes has had numerous challenges in adjusting to life without her left leg. Agnes values her independence and does not want to impose burden of her care on loved ones. Since the

---

[2] It is unknown who "report[ed]" this incorrect information to Emergency Room personnel. Portions of the officers' discussions with on-scene medical personnel occurred while body cameras were muted.

amputation, she is more dependent upon acquaintances. She is also slower in completing activities. Her life has forever changed.

88. Agnes's vehicle was impounded. She has not had it in her possession since September 2, 2023.

89. Agnes has retained experienced civil rights counsel to pursue an action arising out of the September 2, 2023, events.

90. Defendants' unlawful actions caused Plaintiff to incur damages and out of pocket expenses, which shall be delineated in accordance with the Federal Rules of Civil Procedure and which Plaintiff is entitled to recover.

91. Plaintiff is further entitled to attorney fees and expenses pursuant to 42 U.S.C. § 1988, pre-judgment interest, and costs as allowable by federal law.

## FIRST CLAIM FOR RELIEF

*(Defendants Wolfenbarger and Mullenax)*

92. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

93. At all times relevant hereto, Agnes had a right to be free from unreasonable stops, searches, seizures, and detentions under the Fourth Amendment to the U.S. Constitution, and Article I, § 14 of the Utah Constitution.

94. At all times relevant hereto, and in the performance of the acts set forth herein, defendants Wolfenbarger and Mullenax actively and personally caused the violations of constitutional rights alleged herein.

95. Through the actions described above, defendants Wolfenbarger and Mullenax violated Agnes's constitutional rights. Their unlawful actions included the use of unnecessary and excessive force against Agnes and an illegal search of Agnes's car.

96. At all times relevant hereto, and in performance of the acts set forth herein, defendants Wolfenbarger and Mullenax acted under color of state law.

97. The unlawful misconduct of Defendants was objectively unreasonable and undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

98. Wolfenbarger's and Mullenax's actions violated Plaintiff's clearly established constitutional rights of which reasonable police officers were aware or should have been aware prior to September 2023.

99. Wolfenbarger's and Mullenax's actions were consistent with Salt Lake City written or unwritten policies and procedures.

100. Wolfenbarger's and Mullenax's actions were consistent with training they had received from Salt Lake City.

101. Wolfenbarger's and Mullenax's actions have been ratified by Salt Lake City.

102. Neither Wolfenbarger nor Mullenax was disciplined after the injuries to Agnes.

**SECOND CLAIM FOR RELIEF**

(Salt Lake City)

103. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

104. At the time of the events alleged herein, Salt Lake City knew, or should have known, that it was unconstitutional to use this type of leg sweep takedown of a minimally resisting nonviolent misdemeanant.

105. Salt Lake City knew, or should have known, that the takedown method used is dangerous and has a substantial likelihood of causing serious injury to the subject.

106. Upon information and belief, after the Tenth Circuit's ruling in 2022, Salt Lake City did not revise its policies, supervision, or training to ensure that this dangerous takedown method was not used under these circumstances. Facts supporting this belief include that at least three SLCPD officers on scene (Wolfenbarger, Mullenax, and a third officer who arrived afterward) appeared to condone its use under these circumstances, the absence of any discipline despite admission of its use in the officers' reports, plain body camera footage, and the severe injuries to Agnes.

107. Salt Lake City acted with deliberate indifference toward Agnes's rights and that of others in like circumstances.

**PRAYER FOR RELIEF**

WHEREFORE**,** Plaintiff requests the entry of a judgment in her favor and against Defendants as follows:

1. A declaratory judgment pursuant to 28 U.S.C. § 2201, declaring that Defendants' actions violated Plaintiff's rights under the Fourth Amendment to the U.S. Constitution as well as Article I, § 14 of the Utah Constitution.

2. A judgment awarding Plaintiff interest on economic losses to the extent permitted by law.

3. A judgment awarding compensation to Plaintiff for her noneconomic loss, emotional distress, and other personal injury resulting from the violation of her constitutional rights.

4. A judgment awarding Plaintiff her costs of suit, including reasonable attorney fees and litigation expenses under 42 U.S.C. § 1988.

5. A judgment awarding such other and further relief, including equitable, declaratory, and injunctive relief, to which Plaintiff may be entitled.

DATED this 31st day of July, 2024.

CHRISTENSEN & JENSEN, P.C.

*/s/ Karra J. Porter*
Karra J. Porter
M. Tanner Clagett
*Attorneys for Plaintiff Agnes J. Martinez*